UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
In re SINA CORPORATION                      **MEMORANDUM AND ORDER**
SECURITIES LITIGATION
-------------------------------X            05 Civ. 2154(NRB)
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

   This federal securities class action is brought on behalf of all persons or entities[1] who purchased the common stock of defendant SINA Corporation ("SINA" or the "company") between October 26, 2004 and February 7, 2005 inclusive (the "Class Period"). Plaintiffs[2] allege that SINA, as well as Yan Wang ("Wang"), Charles Guowei Chao ("Chao"), and Frank Hurst Lin ("Lin") (collectively, the "Individual Defendants"), all officers of SINA during the Class Period, violated the federal securities laws by failing to disclose to investors certain material facts relating to SINA's revenue growth, thereby damaging plaintiffs when those facts were eventually disclosed. See Consolidated Amended Class Action Complaint ("Compl."). Plaintiffs claim that SINA's non-disclosures violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange

---

[1]    As is customary, the class excludes the officers and directors of SINA, their immediate families, and their legal representatives, heirs, successors, or assigns, as well as any entity in which the defendants have or had a controlling interest.

[2]    On July 1, 2005, this Court issued a Memorandum and Order consolidating six separate actions and appointing the MAPERS Funds Group the lead plaintiffs and designating Lerach Coughlin Stoia Gellar Rudman & Robbins LLP ("Lerach Coughlin") the lead counsel for the class. See Xianglin Shi v. SINA Corp., 05 Civ. 2154(NRB), 2005 WL 1561438 (S.D.N.Y. July 1, 2005).

Act") and Rule 10b-5 promulgated thereunder, and claim that the Individual Defendants are additionally liable for violations of Section 20(a) of the Exchange Act. Id. Defendants now move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). The motion is granted.

**BACKGROUND**[3]

**A. Parties and Causes of Action**

Defendant SINA Corporation is a "leading online media company and value-added information service provider in the People's Republic of China (the "PRC" or "China") and in the global Chinese communities." Id. ¶ 10. SINA provides services through five distinct platforms: (1) SINA.com, which focuses on online news and content; (2) SINA Mobile, which focuses on mobile value-added services; (3) SINA Online, which focuses on community-based services and games; (4) SINA.net, which focuses on search and enterprise services; and (5) SINA E-Commerce, which focuses on online shopping and travel. Id. ¶ 25. Defendant Wang served as SINA's Chief Executive Officer during the relevant period, while defendant Chao served as SINA's Chief Financial Officer and Co-Chief Operating Officer with defendant Lin. Id. ¶ 11.

---

[3]    All facts are drawn from the Consolidated Amended Class Action Complaint (the "complaint") and are assumed to be true for the purposes of this motion.

The complaint asserts two causes of action.  The first alleges that all defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by disseminating false and misleading information with the effect of artificially inflating the price of SINA's common stock.  Id. ¶¶ 74-83.  Specifically, plaintiffs allege that the defendants knowingly deceived the investing public by failing to disclose the extent to which SINA's revenues were dependent on its fortune-telling services, which were then coming under increasing scrutiny by the Chinese government, and by failing to advise investors of the adverse effects that would result from a government-mandated change in SINA's billing practices.  Id.  ¶¶ 74-83.  The second cause of action alleges that the Individual Defendants violated Section 20(a) of the Exchange Act because they allowed the fraudulent statements alleged in the first cause of action to be released to the public.  Id. ¶¶ 84-86.

**B. Facts**

**i. SINA's Fortune-Telling Services**

The Chinese government has long been concerned with regulating the media content accessible to its citizens.  Id. ¶ 33.  As relevant here, China has consistently restricted both content and advertising related to superstitious practices, including fortune-telling services.  Id. ¶¶ 33-34, 40.  As early as February 1995, Chinese law prohibited general advertising

3

relating to superstition, and by February 1997, such advertisements were prohibited on television and radio. <u>Id.</u> Throughout the ten years prior to the Class Period, the Chinese government enacted a series of regulations restricting advertisements, several of which dealt with superstition. <u>Id.</u> Despite the legal prohibitions, however, the complaint alleges that such advertising continued throughout those ten years. <u>See e.g.</u> <u>id.</u> ¶¶ 41, 42.

On January 1, 2004, several laws and regulations took effect in China, including a new regulation banning radio and television advertisements for content advocating superstitious thinking.[4]  On May 13, 2004, Agence France Presse reported that the Chinese government was tightening its controls over content on state television and, in particular, cracking down on stations that had long flaunted government regulations relating to violence, sex and superstition. <u>Id.</u> ¶ 35.  Subsequently, in early August 2004, China Mobile Communication Corporation ("China Mobile"), a government-controlled telephone carrier, and the Ministry of Information Industry, a government agency,

---

[4]    In December 2003, shortly before the Chinese government enacted these regulations, SINA and other Chinese Internet news and information providers agreed to a Self-Discipline Pledge (the "Pledge") committing, <u>inter</u> <u>alia</u>, to "resist firmly the Internet transmission of harmful information such as obscenity, pornography and superstition . . . ."  Compl. ¶ 30.

suspended SINA's Interactive Voice Response System ("IVR")[5] because IVR had posted some pornographic content and because SINA had expanded the dialing numbers for IVR without government authorization.  Id. ¶ 31.  An August 12, 2004 report by Piper Jaffray, a financial services institution, stated that news of the suspension "created heavy selling pressure on SINA as well as nearly all other Chinese Internet and wireless stocks for fear that this event mark[ed] yet another chapter in restrictions that [would] lead to further revenue declines in wireless services."  Id.

On March 15, 2004, after the new regulations took effect, but before the suspension of IVR, SINA released its Form 10-K for 2003 (the "2003 10-K"), reflecting $64.4 million in revenues from mobile value-added services, approximately 56% of SINA's total revenue that year.  Id. ¶ 26.  The 2003 10-K provided brief explanations of SINA's mobile value-added services, including its Short Messaging Service ("SMS"), Multimedia Messaging Service ("MMS"), Wireless Application Protocol ("WAP"), and IVR, but did not specifically state that fortune-telling services constituted a significant part of its value-added business.[6]

---

[5]     For a description of IVR, see footnote 6, infra.
[6]     The 2003 10-K explained SINA's four mobile value-added services as follows:

On October 26, 2004, the first day of the Class Period, SINA issued a press release touting its third quarter results. The press release stated that "SINA continued to benefit from its diversified product offerings in mobile value-added service."  Id. ¶ 49.  Again, this press release made no mention of fortune-telling services.  Id.  That same day, the company held a conference call with its investors, during which Wang stated, "We believe that China is a long-term grow [sic] story, and we are very excited about the long-term growth opportunities in our market."  Id. ¶ 50.  Chao also commented at that time

SMS: As many mobile phones are able to display and send text in Chinese, SINA developed a suite of services that includes user-customized information subscription, personal greetings, customized mobile phone screen decoration, personalized ring tones, mobile dating service and mobile games.

MMS: Using general packet radio service (GPRS) technology, MMS enables users to download color pictures and sophisticated ring tones, as well as to transmit more data per message.  SINA currently provides MMS services in five major categories: MMS downloads, MMS news, MMS love, MMS jokes, and MMS dating/games.

WAP: SINA's WAP services allow users to browse content on their mobile phones similar to accessing information on Internet web sites. SINA's WAP services use GPRS technology to provide users with color pictures and graphics, sophisticated ring tones, news, chatting and dating, games and entertainment.

IVR: SINA's IVR service provides mobile phone users with voice content, including chatting and dating, news information and interactive games.

Compl. ¶ 27.

that the company was pleased by its "record-setting quarter", noting that SINA was "helped by a much better than expected revenue contribution from mobile value-added service." Id. Defendant Chang and an unidentified company representative added that direct media advertising of mobile value-added services was fueling SINA's revenue growth. Id. The next day, shares of SINA's common stock climbed $7.10, closing at $35.29 per share.[7]

Subsequently, on November 9, 2004, SINA filed a Form 10-Q with the SEC, reflecting the third quarter results described in the earlier press release. Id. ¶ 52. The 10-Q stated: "Mobile value-added services revenues are derived principally from providing mobile phone users with SMS, MMS, WAP services and IVR services . . . includ[ing] news and other content subscriptions, mobile dating service, picture and logo download, ring tones, ring back tones, mobile games, chat rooms and access to music files." Id.

Three months later, on February 7, 2005, SINA issued a press release entitled, "SINA Reports Fourth Quarter and Full Year 2004 Financial Results." Id. ¶ 54. This release disclosed that, in late January 2005, the State Administration of Radio,

---

[7] On October 28, 2004, two days after the issuance of this press release, the State Administration of Radio, Film and Television issued new regulations, effective November 28, 2004, relating to "foreign investment in television and film production companies." Compl. ¶ 37. Specifically, the regulations "strictly prohibited" joint ventures "from producing and dealing in programmes" involving "content that propagates heretical teachings or superstition." Id.

Film and Television ("SARFT") "issued a notice which stated that certain commercials for mobile value-added services relating to 'fortune-telling' are prohibited from airing on radio and television stations . . . ." (the "January 2005 Edict"). Id. The release explained that, in response to the January 2005 Edict, various radio and television stations had informed SINA that they would no longer air commercials relating to its fortune-telling services, and that the "effect of such terminations [would] effectively stop almost all of the Company's current promotional efforts for its usage-based SMS products via direct advertising on radio and television." Id. That same day, defendant Lin informed investors during a conference call that SINA did not know that the government planned to enact the January 2005 Edict. Id. ¶ 56. On the contrary, Lin said that SINA only learned about the January 2005 Edict because television and radio stations had notified SINA that they could no longer advertise fortune-telling services. Id.

The press release further stated that, because SINA had started a mandated transition to a new billing system, discussed infra, it saw a "significant reduction in revenues from MMS" and cautioned that, as SINA continued to migrate to the new system, it faced a "30% to 50% reduction of MMS revenues." Compl. ¶ 54.

8

SINA predicted a quarter to quarter decline from its mobile value-added services of 20% to 30%. Id. ¶ 5.

On February 8, 2005, the next trading day, the price of SINA common stock declined by $2.96 per share, a drop of approximately 11%. Id. ¶ 55. In response to a question from a JP Morgan analyst, defendant Chao estimated that SINA's revenues from fortune-telling services were between $10 million and $12 million in the fourth quarter of 2004. Id. ¶ 56. Subsequently, Piper Jaffray and Pacific Growth Equities each reduced its rating on SINA stock. Id. ¶ 57. Also on February 8, a piece appearing on CBSMarketwatch.com referenced a note sent by James Mitchell, a Goldman Sachs analyst, to his clients, in which Mitchell suggested that "if he'd known that fortune-telling services were driving SINA's business, he wouldn't have been so optimistic" in promoting the stock. Id. ¶ 58. The following day, ChinaTechNews.com published an article intimating that SINA knew all along that its business was on "uneven footing" as a result of the regulatory conditions present in China, and suggesting that "Sina's executive team has an 'Us Versus Them' mentality when it comes to investors." Id. ¶ 59. On March 20, 2005, an article in the Chicago Sun-Times stated that SINA "didn't own up to what its 'value-added services' were until China banned such advertising." Id. ¶ 60.

### ii. Transition to the MISC Billing Platform

Plaintiffs also allege that defendants failed to disclose the negative impact that a government-mandated change in its billing process would have on the company's revenues. Id. ¶ 44. Prior to the start of the Class Period, China Mobile began transferring some of its wireless service provider customers, including SINA, onto the Mobile Information Service Center ("MISC"), a new billing platform. Id. This platform was designed to enable carriers to more effectively monitor both the content of value-added services and the billing practices of service providers, though it imposed some costs on SINA and others in the process. Id. During a conference call following SINA's announcement of its financial results for the third quarter of 2004, on October 26, 2004, defendant Chao stated, "We are not able to assess the exact impact of [the MISC] platform at this point . . . but the net income may be some how [sic] mitigated by other positive factors." Id. ¶ 45.

During the February 7, 2005 conference call discussed above, defendant Lin characterized the policy changes enacted by China Mobile as "sudden and completely unexpected", claiming that SINA was "caught off guard" by the developments. Id. ¶ 56. Lin further stated that "the new MMS billing process [would] have a 30 to 50 percent negative impact on . . . MMS revenues . . . ." Id. ¶ 56. SINA would later acknowledge in its 10-Q form filed on August 9, 2005, that "recruitment of new users [became]

10

more difficult, and . . . fee collection rates . . . declined"
as a result of the transition to MISC.  Id. ¶ 44.

### iii. Allegedly False and/or Misleading Statements

Plaintiffs allege that the defendants violated securities
laws by failing to disclose: (1) that SINA's earnings from its
Mobile value-added services division were heavily dependent on
revenues from its fortune-telling services; (2) that a
substantial portion of SINA's revenues were generated from radio
and television advertisements for its fortune-telling services;
and (3) that SINA's future MMS revenues would be significantly
reduced as a result of the transition to the MISC billing
process.  See id.  Plaintiffs describe both the public documents
filed by SINA and the oral statements made by the Individual
Defendants as false and misleading, and point to the newspaper
articles cited above as evidence that the defendants knowingly
made false and misleading statements.  Id.

### iv. Scienter

In addition to making general allegations that defendants
were actually aware that their statements were false and
misleading, plaintiffs allege that several company insiders,
including the Individual Defendants, sold $34,443,720 worth of
SINA common stock during the Class Period, and that these sales
tend to show scienter.  See e.g. id. ¶ 65.  Specifically,
plaintiffs allege that, during the Class Period, Wang sold

154,000 shares, worth $5,298,021; Chao sold 155,000 shares, worth $5,378,650; and Lin sold 215,833 shares, worth $7,425,792. Id. ¶ 65. Plaintiffs allege that these sales were unusual in both timing and amount, compared with similar sales made by company insiders during the preceding eighteen months, giving rise to an inference that the defendants anticipated a drop in SINA stock upon full disclosure of the foregoing facts. Id.

**v. Reliance**

Plaintiffs claim that the market for SINA's common stock was efficient at all relevant times, as evidenced by: the fact that the company met the requirements for listing on NASDAQ; its regular filing of reports with the SEC and NASDAQ; and its regular communications with the investing public. Id. ¶ 66. Relying on a fraud-on-the-market theory, which may give rise to a presumption of reliance, plaintiffs allege that both the rise in SINA's common stock in late October 2004 and its subsequent drop in February 2005 were the direct result of SINA's public disclosures. See id.

**DISCUSSION**

**A. Legal Standards**

In deciding a Rule 12(b)(6) motion to dismiss, this Court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the non-movant's favor. Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999).

12

Dismissal is appropriate only when it is clear that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief.  Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 356 (2d Cir. 2002).  In deciding a motion to dismiss, a court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."  Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (citations omitted).

Rule 10b-5 specifies the behavior that Section 10(b) forbids, making it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of circumstances under which they were made, not misleading . . . ."  17 C.F.R. § 240.10b-5.  "To state a valid cause of action under section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury."  Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (quoting San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996)).

A securities fraud complaint must also satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) and of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA").  The Second Circuit has interpreted Rule 9(b) to require that complaints "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (quoting cases).  Similarly, the PSLRA requires that complaints "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).

**B. Analysis**[8]

Plaintiffs allege that SINA had an obligation to inform investors of the extent to which fortune-telling services were fueling the company's revenue growth in light of China's increasingly strict enforcement of regulations prohibiting radio and television advertisement of superstitious content.  They further allege that SINA failed to adequately warn investors that the government-mandated transition to the MISC billing process would result in a significant decline in revenue.  For

---

[8]    The Court heard oral argument on the instant motion on August 8, 2006.  The abbreviation "Tr." refers to the transcript of that hearing.

14

the reasons discussed below, plaintiffs' allegations are insufficient to state a cause of action.

### i. Plaintiffs Fail to Make Allegations with Required Specificity

Plaintiffs' allegations concerning the defendants' failure to disclose material facts do not specifically identify how or why any particular representations were misleading.  Instead, the complaint sets forth large block quotes taken from public statements made by the Individual Defendants and from SEC filings, followed by generalized explanations of why the statements collectively misled the plaintiffs.[9]  See e.g. Compl. ¶¶ 49-53.  General allegations of this sort fail to satisfy the pleading requirements of Rule 9(b) and of the PSLRA, which require a heightened degree of specificity.  See Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("[P]laintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so.").  For example, plaintiffs quote Wang's comment that "China is a long-term grow [sic] story" and quote Chao's statement that SINA is "not able to assess the exact impact" of the transition to MISC.  These statements are simply

---

[9]     Although the complaint states that some of the defendants' statements were "materially false and misleading", it is clear from both the allegations contained in the complaint and from the representations made by plaintiffs' counsel during oral argument that, with regard to their allegations involving the failure to disclose the extent to which mobile value-added services were responsible for revenue growth, plaintiffs only intended to allege that certain statements were misleading, not that they were false.

too vague to be considered misleading. Moreover, Chao's statement that SINA was pleased by its "record-setting quarter" due to "a better than expected revenue contribution from mobile value-added service", Compl. ¶ 50, is not actionable because plaintiffs have not alleged that SINA did not have a record-setting quarter or that mobile value-added services did not fuel SINA's revenue growth. Similarly, the other statements identified by plaintiffs as misleading are not apparently so, and the complaint fails to clarify in what way plaintiffs were misled by any particular statement.

**ii. SINA was Not Required to Disclose Additional Information**

Even if plaintiffs pled with greater specificity, their allegations would not subject SINA to liability under Rule 10b-5. In determining whether defendants' non-disclosures are actionable under Rule 10b-5, we begin with the proposition that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic Inc. v. Levinson, 485 U.S. 224, 239, n.17 (1988). Moreover, "[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor." Resnick v. Swartz, 303 F.3d 147, 154 (2d Cir. 2002). Rule 10b-5 states that a material omission is actionable only if the disclosure of certain information is "necessary to make the statements made, in light

16

of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

Plaintiffs allege that "[o]nce the Defendants chose to make statements about the reasons for its revenue growth . . . , they then became obligated to speak truthfully and fully about these statements." Pl. Memo. of Law at 8. Specifically, they allege that defendants were required to disclose "that the real reason for the increase of revenues was because [mobile value-added] services, which primarily consisted of fortune-telling services, were being promoted in advertisements in television and radio despite the Chinese government's earlier adoption of Provisional Measures prohibiting content advocating superstitious thinking, such as fortune-telling." Id. We find that these non-disclosures cannot form the basis for a 10b-5 action.[10]

We begin with the press release issued on October 26, 2004, marking the beginning of the Class Period. Although plaintiffs do not clearly single out any portion of the release as materially misleading, they seem to argue that SINA's statement that it "continued to benefit from its diversified product offerings in mobile value-added service[s]" violated Rule 10b-5

---

[10]    We note that plaintiff declined to provide a clear picture of the content of SINA's advertisements. Obviously, if the advertisements credited their source (as is ordinarily the case, at least in the United States), plaintiffs' suggestion that there was a material non-disclosure would be even weaker, as openly advertising a service is inconsistent with trying to hide its existence. Because the Court is unaware of the nature of these advertisements, however, we do not make a finding on this point in reaching our conclusions.

17

because defendants did not explain that revenues from those services relied heavily on advertising for fortune-telling. In their complaint, plaintiffs quote a Goldman Sachs analyst who commented at the close of the Class Period that he would not have been so optimistic about SINA's stock had he known the extent to which its revenues were dependent upon advertising for fortune-telling services. Plaintiffs failed, however, to quote a statement in that same report, in which the analyst commented that the "fact that we did not know fortune-telling . . . accounted for 30% of Sina's wireless revenues and 20% of its total revenues should be seen as <u>a failure of research on our part rather than disclosure on Sina's</u>, since tipping off rival . . . operators would merely intensify competition in the product." Request for Judicial Notice ("RJN") Ex. Q at 1 (emphasis added).[11] Thus, on the one hand, plaintiffs rely on

---

[11]    In deciding a Rule 12(b)(6) motion, the Court may consider the following materials:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

18

this report for the proposition that SINA should have more fully disclosed the source of its revenue growth, but on the other hand, fail to note that the very same report found fault only with Goldman Sachs, not with SINA, in failing to discover information that was publicly available.

Moreover, the facts alleged in the complaint irrefutably establish that it was SINA's practice to inform its investors of the potential risks that the company faced due to the unpredictable nature of Chinese government regulation. For example, the 10-Q that SINA filed on August 9, 2004 emphasized the risks of operating in an uncertain regulatory environment, explaining that SINA might "be adversely affected by complexity, uncertainties and changes in [China's] regulation of Internet business and companies" and that the "Chinese government heavily regulates . . . the existence and enforcement of content restrictions." RJN Ex. A at 31. Further, SINA explained that "numerous and often vague restrictions on acceptable content in China subject [it] to potential civil and criminal liability" and that it is "difficult to determine what actions or omissions may result in liability." Id. Similarly, the 10-Q filed on November 9, 2004, shortly after the beginning of the Class

_In re Merrill Lynch & Co, Inc._, 273 F.Supp.2d 351, 356-57 (S.D.N.Y. 2003), _aff'd_, 396 F.3d 161 (2d Cir. 2005) (internal citations omitted).  All of the documents submitted by defendants in their RJN and cited in this Opinion fall into at least one of these categories.

Period, noted that China Mobile had unexpectedly suspended SINA's IVR services due to perceived inappropriate content. The 10-Q stated that "[t]he definition and interpretation of inappropriate content in many cases is vague and subjective. We are not sure whether mobile operators . . . or [the] Chinese government will find our other mobile content inappropriate. . . ." RJN Ex. F at 39 (emphasis added). In light of the public filings disclosing that the company was in constant danger of being harmed by government action, we fail to see how plaintiffs can argue that SINA failed to disclose the risks associated with operating in China.

Plaintiffs also contend that SINA was required to disclose the extent to which fortune-telling services drove its revenue growth. We disagree. First, plaintiffs do not allege that anyone foresaw the January 2005 Edict, nor do they allege that defendants could have anticipated its strict enforcement once issued. In fact, the Piper Jaffray analyst report cited by plaintiffs in their complaint characterizes the January 2005 Edict as a "surprise decision." RJN Ex. M at 1. Plaintiffs themselves acknowledge the uncertainty surrounding regulation of fortune-telling services, quoting a ChinaTechNews.com article stating that "[f]ortune-telling has for decades been a slippery business endeavor to promote in China on the grounds it encourages superstition." Compl. ¶ 59. Such statements do not

suggest that SINA should have known that its revenue stream from fortune-telling services was something of immediate concern to investors. Moreover, as acknowledged by the Goldman Sachs analyst quoted earlier, the allegedly omitted information was already public knowledge.

Similarly, the statements that the defendants made relating (1) to the growth in revenues from mobile value-added services; and (2) to the effect of the transition to the MISC platform, are non-actionable because a company may not be held liable for accurately stating its past results. See In re Duane Reade Inc. Securities Litig., 02 Civ. 647(NRB), 2003 WL 22801416 at *6 (S.D.N.Y. Nov. 25, 2003), aff'd, 107 Fed. Appx. 250 (2d Cir. 2004). Even if the defendants' statements concerning past performance are construed as generally optimistic pronouncements of SINA's future business prospects, they still cannot substantiate a 10b-5 claim. See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 2004) (comments not actionable where "the attributed public statements lack the sort of definite positive projections that might require later correction."). Here, defendants accurately suggested the uncertainty involving potential changes to its billing platforms and, as discussed infra, made no attempt to mislead investors. Consequently, plaintiffs cannot state a claim under Rule 10b-5

21

relating to SINA's statements about the change in billing processes.

Finally, and most importantly, materiality must be assessed prospectively, not retrospectively. Undisclosed information is material only if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). Here, plaintiffs essentially argue that defendants should have disclosed information because they should have anticipated the actions of the Chinese government. However, "defendants' lack of clairvoyance simply does not constitute securities fraud." Acito, 47 F.3d at 53 (citing Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)). In the absence of any allegation that defendants could have foreseen the eventual crackdown on SINA's advertising, we fail to see how fuller disclosures about SINA's revenue sources would have been useful to investors who had already been thoroughly and repeatedly warned about the risks of investing in a Chinese company.

In short, plaintiffs' allegations constitute a transparent attempt to plead fraud by hindsight. SINA extensively warned its investors both about the peril of potential government

22

restrictions and of the risks involved with "the Company's reliance on mobile operators in China to provide mobile value-added service."  RJN Ex. A at 26-28.  It acknowledged candidly and repeatedly – before, during, and at the end of the Class Period — that it could not predict the actions of the Chinese government and the potential effect of those actions on the company.  Of course, had SINA known of the government's intentions, its disclosure obligations might have been different.

**iii. The "Bespeaks Caution" Doctrine and Safe Harbor Rule**

In light of SINA's extensive statements cautioning investors about the risks inherent in operating in China, the "bespeaks caution" doctrine also applies.  "Under the 'bespeaks caution' doctrine, 'courts have held that meaningful cautionary language can render omissions or misrepresentations immaterial.'"  Duane Reade, 2003 WL 22801416 at *5 (quoting In re Donald Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993)).  The PSLRA also provides a safe harbor for situations where statements have been accompanied by adequate cautionary language.  See 15 U.S.C. § 77z-2(c)(1)(A)(i) (1997) (stating that there is no liability for statements "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . .").  An exception exists

23

to this rule only where "(1) the forward-looking statement was made with actual knowledge that it was false; or (2) where the forward-looking statement misrepresents present facts." Duane Reade, 2003 WL 22801416 at * 5 (citing In re Oxford Health Plans, Inc., 187 F.R.D. 133, 141 (S.D.N.Y. 1999). Plaintiffs dispute the applicability of the "bespeaks caution" doctrine and the safe harbor rule, arguing that the defendants' cautionary statements were not sufficiently meaningful to trigger their applicability. They also argue that the cautionary language does not directly relate to the topics on which plaintiffs claim to have been misled, as required by the Second Circuit. Citing Hunt v. Alliance North Am. Gov't Income Trust, Inc., 159 F.3d 723, 729 (2d Cir. 1998) (cautionary language "must relate directly to that by which plaintiffs claim to have been misled"). These arguments are without merit.

Plaintiffs insist that defendants failed to specifically warn investors "about the potential risk to the Company of the Chinese government's regulation of advertising on television and radio . . . ." Pl. Memo. of Law at 15. We disagree. The October 26, 2004 press release specifically warned investors of the inherent uncertainties involved in navigating the treacherous regulatory landscape in China. Moreover, the 10-Q filed on November 9, 2004 contained an additional warning that SINA was not sure whether the Chinese Government would take

24

action to prevent the company from continuing to operate its mobile value-added services and specifically stated that any such action would result in diminished profits.  RJN Ex. F at 39.  Similarly, SINA warned investors about the risks inherent in relying on China Mobile.  In light of these statements, we fail to understand how plaintiffs can now allege that they were not warned of the potential risks involved in investing with SINA.  Obviously, SINA was not able to predict exactly what risks existed, as it was not privy to the decision-making processes of the Chinese government, but considering the extensive cautionary language that permeates SINA's public disclosures, we conclude that, to the extent that any non-disclosures rendered defendants' statements materially false or misleading, the defendants would nonetheless be entitled to protection under the "bespeaks caution" doctrine and the PSLRA safe harbor rule.

In so finding, we also conclude that neither of the exceptions to the safe harbor rule applies, despite plaintiffs' allegation that defendants knew that the transition to the MISC platform would reduce SINA's revenues.[12]  This allegation is without merit, as plaintiffs plainly confuse two separate actions taken by China Mobile.  SINA's February 7, 2005 press release disclosed both that China Mobile had just changed its

_____

[12]    See supra at 22-23.

25

billing process for MMS, significantly reducing MMS revenues, and that the migration of MMS to a different platform might further reduce MMS revenues. The release and the contemporaneous conference call made clear that the change in the billing process would have a much greater impact than the migration of MMS to a new platform. The complaint, however, focuses on an earlier migration of SMS to a new platform, which occurred in 2004 and was not the subject of the February 7 press release. By conflating these separate events, plaintiffs undermine the allegation that defendants knew but failed to disclose that the change in billing processes for SINA's MMS services would adversely affect revenues. In fact, defendants issued clear warnings before the Class Period began that SINA's "fee arrangements with China Mobile . . . could change at any time," and that China Mobile could "dictate the terms of such fee arrangements." RJN Ex. A at 27. SINA specifically cautioned investors that, "[i]f China Mobile . . . chose to increase fees charged for providing [mobile] services, [SINA's] gross margin for mobile value-added services and [its] operating profitability could be negatively affected." Id. Consequently, plaintiffs fail to adequately plead that defendants made any knowingly false statements relating to the actions of China Mobile.

**iv. Scienter**

Even if the plaintiffs had adequately pled that defendants knowingly made false statements or failed to disclose any material fact, we would nonetheless dismiss the complaint for failure to adequately plead scienter.

Rule 9(b) of the Federal Rules of Civil Procedure sets forth heightened pleading requirements for fraud actions:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed. R. Civ. P. 9(b).    In order to "curtail the filing of meritless lawsuits," the PSLRA imposes additional and more stringent requirements on plaintiffs alleging securities fraud. Novak, 216 F.3d at 306 (quoting H.R. Conf. Rep. No. 104-369, at 41 (1995)).   In relevant part, the PSLRA provides:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . .

15 U.S.C. § 78u-4(b)(1).   In addition, "in any action where plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind," the complaint shall "with respect to each act or omission alleged to violate

27

this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). The required state of mind, which has been described as an intent to "deceive, manipulate or defraud," Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000) (citations omitted), can be pled either (1) by "alleging facts to show that defendants had both motive and opportunity to commit fraud" or (2) by "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. at 168-69. Plaintiffs have not alleged facts sufficient to support allegations of motive, conscious misbehavior or recklessness.

### a. Motive

In order to adequately allege motive, plaintiffs must identify concrete benefits that could be attained through the alleged misstatements or omissions. See Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001)(stating that allegations must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."). The benefit alleged must be one that will accrue to the Individual Defendants. See id. at 139 (citing Novak, 216 F.3d at 307-308). General benefits to the corporation will not suffice. Id. The Second Circuit has expressly held that the motive of keeping a company's stock price high is insufficient

to sustain a plaintiffs' pleading burden.   Novak, 216 F.3d at 307 (citing Acito, 47 F.3d at 54).

Here, the plaintiffs allege that the Individual Defendants' trading activity in SINA stock reveals that their sales during the Class Period "were unusual in both timing and amount, as compared with similar sales that were made in the prior 18 months."   Compl. ¶ 65.   This allegation, however, is contradicted by the facts.

Under Second Circuit law, unusual stock sales by insiders may give rise to an inference of bad faith or scienter.  See In re Scholastic Corp. Securities Litigation, 252 F.3d 63, 74 (2d Cir. 2001).   "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." Id. at 74-75 (citing Rothman v. Gregor, 220 F.3d 81, 94 (2d Cir. 2000).   In arguing that the Individual Defendants' trading activity during the Class Period was unusual, the plaintiffs only list sales that occurred during the Class Period; they do not include previous sales, thus leaving the Court unable, from the face of the complaint, to determine if their activities were truly "unusual."   However, the Court is entitled to take

29

judicial notice of SINA's filings with the SEC,[13] enabling us to conclusively determine that the Individual Defendants' trading activity during the Class Period was not at all unusual when compared with their prior activity.

Moreover, plaintiffs' allegations that SINA insiders sought to "sell their personally-held shares of SINA stock at artificially inflated" prices notwithstanding, Compl. ¶ 65, in fact, the Individual Defendants collectively held 31,532 more shares of SINA stock at the time of the mid-2005 proxy than they did at the time of the mid-2004 proxy.[14]  See RJN Ex. T-Y.  If the Individual Defendants indeed failed to disclose certain facts in order to personally profit from inside information, one would reasonably expect that they would hold fewer shares of stock before the anticipated plunge in the stock's price than they held the year before.  Further, any sales made by the Individual Defendants during the Class Period cannot give rise to an inference of scienter because (1) the sales occurred more than a month before China Mobile's announcement of the change in billing processes, (2) the January 2005 Edict occurred at the end of the class period,[15] and (3) plaintiffs do not allege that

---

[13]    See footnote 5, supra.
[14]    Plaintiffs avoided this conclusion in the complaint by listing only sales – not purchases – made by defendants during the class period.
[15]    Additionally, none of the Individual Defendants sold any shares of SINA stock between the time of China Mobile's actions and the company's February 7, 2005 press release.  This period would have been

30

defendants had any advance notice that these actions were forthcoming. Had plaintiffs alleged (1) that defendants knew that the Chinese government was about to enact new regulations that would adversely affect the price of SINA stock; and (2) that the Individual Defendants had personally benefited from their knowledge by selling SINA shares before publicly announcing those regulations, plaintiffs might have been able to suggest a motive for violating the securities laws. However, all of the Individual Defendants' trading activity during the Class Period occurred in October and November, before SARFT's and China Mobile's actions, and consistent with the Individual Defendants' sales in prior years. See RJN Ex. T-Y (reflecting sales by the Individual Defendants in October and November 2003, February 2004, and October and November, 2004). Consequently, there is no basis for the Court to conclude that the Individual Defendants' trading activity reflects a desire to personally benefit from misrepresenting the state of SINA's affairs.

### b. Conscious Misbehavior or Recklessness

Similarly, there is no "strong circumstantial evidence" that the Individual Defendants engaged in conscious misbehavior or recklessness. Kalnit, 264 F.3d at 142. In order to plead recklessness, plaintiffs must allege that defendants' behavior

---

the most obvious time for the Individual Defendants to trade on any inside information they possessed, yet none of them sold any SINA stock during the month before the announcement.

was "highly unreasonable," constituting "an extreme departure from standards of ordinary care to the extent that the danger was known to the defendant or so obvious that the defendant must have been aware of it."    Novak, 216 F.3d at 308 (citations omitted).    Here, SINA was consistently forthcoming in explaining to investors the risks inherent in navigating the Chinese regulatory system.    Because there is no evidence that defendants knew of the SARFT or China Mobile actions in advance, there is no basis to conclude that the defendants engaged in conscious misbehavior or recklessness.

Thus, the complaint altogether fails to support the conclusion that the defendants acted with intent to deceive or defraud the public or that they were reckless in this regard. For this reason, dismissal is required under Fed. R. Civ. P. 12(b)(6) and the PSLRA, 15 U.S.C. § 78 u-4(b)(3)(A).

**v. Damages**

Although we dismiss for failure to state a claim irrespective of any proof of damages, we nonetheless briefly comment on plaintiffs' damages allegations.    The complaint alleges that, as a result of the alleged non-disclosures, "the market prices of SINA's common stock were artificially inflated during the Class Period."    Compl. ¶ 80.    As a corollary, plaintiffs suggest that they "would not have purchased or otherwise acquired their SINA common stock" had they known about

the extent to which SINA's revenues were derived from fortune-telling services.  Compl. ¶ 81.

These allegations are premised on the presumption that the revenues derived from fortune-telling services were significant when measured against SINA's total revenues.  Plaintiffs, however, have provided the Court with little evidence suggesting that these services, which constituted one source of revenue in one of SINA's five business platforms, were a particularly significant source of income for SINA.  In fact, despite plaintiffs' argument that revenues from these fortune-telling services were "actually driving the revenue growth of the company," Tr. 14, the February 8, 2005 drop in SINA's stock price was short-lived.[16]  The stock regained its February 7, 2005 price within seventeen days and continued to rise from there. During the entire month of March, the stock never dropped below $30.43 per share, approximately 25% higher than its price on February 7, 2005.  Consequently, we find it difficult to conclude that fortune-telling services were as material a source

---

[16]    In their request for judicial notice, defendants attached a day-by-day summary of SINA's closing stock prices for the period from November 3, 2004 through February 7, 2005, the final day of the class period.  See RJN, Ex. Z.  Inadvertently, defendants failed to include stock prices for the period after the February 7 press release. However, the Court is entitled "to take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment."  Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 n.8 (2d Cir. 2000) (citations omitted).  Thus, we are entitled to consider the trajectory of SINA's stock price, before, during and after the Class Period.

of revenue as plaintiffs aver.

**vi. Section 20(a) Claim**

Section 20(a) of the Exchange Act extends liability to individuals who control section 10 violators. See 15 U.S.C. § 78t(a).  Because the complaint fails to state a claim under section 10(b) and Rule 10b-5, there can be no controlling person liability.  See e.g. Rombach, 355 F.3d at 177-78 (citations omitted).  We therefore grant defendants' motion to dismiss the section 20(a) claim as well.

CONCLUSION

Because the allegations set forth in the complaint fail to state a claim and do not satisfy the pleading requirements of either Fed. R. Civ. P. 9(b) or the PSLRA, we grant defendants' motion to dismiss in its entirety.

Plaintiffs have requested leave to amend the complaint in the event that this Court concluded that dismissal of the complaint is appropriate.  Pl. Mem. of Law at 25, n.22. However, even after briefing and oral argument, plaintiffs have provided no information regarding what new facts they might plead that would potentially alter our conclusion that dismissal is appropriate, and we know of no obvious gaps in the facts as pled that suggest any reason why an amended complaint would survive a motion to dismiss.  Because this Court has concluded that further amendments would be futile, the dismissal is

granted without leave to amend the complaint. See e.g. San Leandro, 75 F.3d at 815; Acito, 47 F.3d at 55.[17]


SO ORDERED.


Dated:    New York, New York
          September 25, 2006

                                    _____
                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

---

[17]    As required by the PSLRA, this Court also notes that it has concluded that both parties have complied with the requirements of Fed. R. Civ. P. 11(b). See 15 U.S.C. § 78u-4(c)(1); see also Rombach, 355 F.3d at 178.

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Counsel for Plaintiff
Samuel H. Rudman, Esq.
Lerach, Coughlin, Stoia, Geller, Rudman, & Robbins, LLP
58 South Service Road, Suite 200
Melville, NY 11747


Counsel for Defendant
Joshua M. Cutler, Esq.
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, NY 10103